<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>

File Name: 19a0535n.06

Case No. 19-3118

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Oct 18, 2019

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STEVEN M. HANK, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| GREAT LAKES CONSTRUCTION COMPANY; | ) | DISTRICT OF OHIO |
| INTERNATIONAL UNION OF OPERATING | ) | |
| ENGINEERS, LOCAL 18, | ) | |
| | ) | **O P I N I O N** |
| Defendants-Appellees. | ) | |

BEFORE: MOORE, McKEAGUE, and LARSEN, Circuit Judges.

**McKEAGUE, Circuit Judge.** This court once observed, "[w]hen a party comes to us with nine grounds for reversing the district court, that usually means there are none." *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012). Steven Hank comes to us with twenty-seven.

Hank's case involves his termination from Great Lakes Construction Company. Defendants are Great Lakes and Hank's union, Local 18, International Union of Operating Engineers. Hank claims that his termination was discrimination and retaliation. Great Lakes and the Union claim it was because Hank falsified his daily timecards. They also point out that Hank signed a release that bars his claims. The district court agreed with Great Lakes and the Union and granted them summary judgment. Hank now comes to us with twenty-seven grounds on which the

district court erred. We find none of Hank's grounds persuasive and therefore AFFIRM the judgment of the district court.

## I.

Before his termination, Hank worked as a sandblaster for Great Lakes. He was also a member of the Union. He began working for Great Lakes in October 2007.

In March 2012, Hank was injured on the job. He tore his meniscus and eventually needed knee surgery. A few months after the accident, he filed a claim with the Ohio Bureau of Worker's Compensation. That claim became a source of tension between Hank and Great Lakes.

Hank wanted more recovery time than Great Lakes was willing to grant him. He alleged that it would take six weeks to recover from his knee surgery, but Great Lakes let him have only thirteen days of unpaid leave. Hank came back to work after only a week and a half of unpaid leave, and he continued to have problems with his knee after he did.

Going back to the Ohio Bureau, Hank requested that Great Lakes cover his prescribed therapies for the complications he experienced after returning to work, including gel injections and occupational therapy. Great Lakes rejected these requests.

Around October and November of 2015, Hank allegedly told his supervisor that he would be filing additional worker's compensation claims. According to Hank, this is when Great Lakes started spying on him to catch him in some act that would justify terminating him.

Then on January 22, 2016, Hank was called into a meeting. There were six other people in the room: five were Great Lakes managers and the other was Hank's union representative. The managers alleged that Hank had falsified some of his employee timecards, meaning he had been paid for work he did not do. They presented Hank with the timecards and offered to show him

video-surveillance footage, which allegedly showed Hank showing up for work later than the time listed on his cards. Hank declined to watch.

The Great Lakes managers then stepped out of the room to give Hank time to consult with his union representative, which he did. When the managers came back, they presented him with a release, entitled the "Acknowledgement and Agreement." The release reads, in its entirety:

> The Great Lakes Company ("Great Lakes") agrees that instead of terminating Steven Hank for falsification of time records, it will place him on lay-off status with no right to recall. In return, Hank agrees that he will not file a grievance under the Collective Bargaining Agreement and that he will not pursue or file any sort of claim against either Great Lakes or his Local 18 of the International Union of Operating Engineers ("Union"). Mr. Hank agrees that he will not seek reemployment at any time in the future with Great Lakes. The Union agrees that it will not pursue or file any grievances on Mr. Hank's behalf.

Hank allegedly asked for clarification, wanting to know what difference it made to be put on layoff status. Great Lakes informed him that if he signed the release and took the layoff status, then he could get unemployment benefits. Shortly after, Hank signed the release, and the meeting ended. Sure enough, Great Lakes placed Hank on layoff status and then paid him unemployment benefits.

About a week later, Hank filed a union grievance. In it, he alleged that he had been terminated because of his ongoing worker's compensation claim with Great Lakes. The Union reviewed the evidence against Hank, including the timecards and the surveillance footage, and determined not to pursue the grievance because Great Lakes had sufficient evidence to terminate Hank for cause.

Hank then sued. He brought claims against both Great Lakes and the Union in the Cuyahoga Court of Common Pleas. Most of the claims were under Ohio state law: disability and age discrimination under Ohio Rev. Code § 4112.02 and § 4112.14, along with worker's

compensation retaliation under Ohio Rev. Code § 4123.90. The one federal claim was "Count IV," which was labeled "Company Breach of Collective Bargaining Agreement / Union Breach of Duty of Fair Representation (Hybrid Section 301 Infraction)." Defendants then removed the case to the Northern District of Ohio, which had federal-question jurisdiction over Count IV under Section 301 of the Labor Management Relations Act, 28 U.S.C. § 185 (even though Hank didn't cite the statute in his complaint), and supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

On July 17, 2018, the court granted summary judgment in favor of Great Lakes. It found that Hank was barred from raising any of the claims against Great Lakes because he knowingly and voluntarily signed a valid release. A few months later, the court also granted summary judgment in favor of the Union, dismissing the federal Section 301 claim. It found that Great Lakes had not breached the collective bargaining agreement and the Union had not breached its duty of fair representation. The court then declined to continue exercising supplemental jurisdiction over the remaining state-law claims. Hank then filed this appeal, challenging the grants of summary judgment.

**Standard of Review**

We review grants of summary judgment de novo. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is proper when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We look at the facts in the light most favorable to the nonmoving party and determine whether a reasonable jury could find in his favor. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005).

## II.

Hank asserts claims against two defendants: Great Lakes and the Union. We proceed by looking first at the claims against Great Lakes, then at those against the Union.

### A.  Great Lakes

Great Lakes succeeded on its motion for summary judgment because the district court found that all the claims against the company were barred by the release. Accordingly, our review of those claims is limited to one question: can the release be validly enforced against Hank? Hank gives several reasons why the answer should be no: (1) the release illegally waives nonwaivable rights, (2) the release is not supported by consideration, and (3) Hank did not sign the release knowingly and voluntarily. We find that each of these arguments is without merit.

#### 1.  Nonwaivable Rights

Hank first contends that the release is void *ab initio*, meaning it was void "from the beginning" and thus was never enforceable. *Black's Law Dictionary* (11th ed. 2019). This is because, he argues, the release purports to waive some of Hank's nonwaivable rights— specifically, his rights to file claims for unemployment benefits, worker's compensation, and future discrimination. But this argument fails because Hank is not asserting any of those rights in this case. Instead, he is asserting claims that were waivable and that he in fact did waive by signing the release: a Section 301 claim, a retaliation claim, and two discrimination claims.

As a general rule of Ohio law, personal rights—whether contractual or statutory—can be waived. *Oliver v. Nat'l Collegiate Athletic Ass'n*, 920 N.E.2d 196, 201 (Ohio Ct. Com. Pl. 2008) (quoting *State ex rel. Hess v. City of Akron*, 7 N.E.2d 411, 413 (Ohio 1937)). Waivers will generally be upheld as long as they do not violate public policy. *Id.* Accordingly, a release waiving

the right to bring legal claims "is ordinarily an absolute bar to a later action on any claim encompassed within that release." *Haller v. Borror Corp.*, 552 N.E.2d 207, 210 (Ohio 1990).

Here, Hank signed a release, saying he would not "pursue or file any sort of claim" against Great Lakes or the Union. Hank brought several claims anyway, alleging discrimination, retaliation, and labor-related theories. Yet he does not point to any public policy declaring these claims nonwaivable, nor do we know of any such policy.[1] From there it seems straightforward: Hank signed a release that waived "any sort of claim" against Great Lakes and the Union, and he now brings waivable claims that fall under the release, so under Ohio law he should be barred from bringing those claims.

But Hank charts a different course. Instead of arguing that his claims *in this case* were not waivable, he argues that the release is worded so generally that it *could* be applied to waive claims that are in fact nonwaivable as a matter of public policy. Specifically, he argues that it could be applied to bar claims for unemployment benefits, *see* Ohio Rev. Code § 4141.32, worker's compensation, *see id.* § 4123.80, and claims arising out of future discrimination, *see Adams v. Philip Morris, Inc.*, 67 F.3d 580, 584 (6th Cir. 1995). And because the release could be read to waive certain nonwaivable claims, the release is void on its face and cannot be applied to bar Hank's claims. In other words, because the release could conceivably be applied in a way that would be illegal, it cannot be applied under any circumstances.

That proposition is not reflected in Ohio law. An examination of how similarly worded releases are applied will illuminate why. Consider, for example, the case of *Bader v. Ferri*, No. 1-

---

[1] Moreover, several Ohio cases enforce similarly worded waivers under several of Hank's chosen causes of action. *See Turner v. Salvagnini Am., Inc.*, No. CA2007-09-233, 2008 Ohio App. LEXIS 3036, at *14 (Ohio Ct. App. July 21, 2008) ("It is well-established that a party can waive claims of discrimination under R.C. 4112.02 in a release."); *Cole v. Temple Israel*, No. 23243, 2007 Ohio App. LEXIS 224, at *16–17 (Ohio Ct. App. Jan. 24, 2007) (enforcing a release of worker's compensation retaliation claim under Ohio Rev. Code § 4123.90).

13-01, 2013 Ohio App. LEXIS 3122, at *17–22 (Ohio Ct. App. July 15, 2013). In *Bader*, the plaintiff signed a release that waived "any and all claims" against the plaintiff's university that "may arise, grow out of, or be incident to" a medical diagnosis or treatment related to illness or injury the plaintiff might sustain as a college athlete. *Id.* at *19. A release worded this generally could conceivably be applied to claims of willful and wanton conduct, which the court noted were nonwaivable. *Id.* Yet the court in *Bader* enforced the release to bar the plaintiff's negligence claims—claims that could properly be waived. *Id.* at *21–22.

In contrast, a similarly worded release was not enforced in *G & J Pepsi-Cola Bottlers, Inc. v. Ohio St. Dep't of Job & Family Servs.*, No. 11AP-444, 2011 Ohio App. LEXIS 5543 (Ohio Ct. App. Dec. 27, 2011). There, the plaintiff signed a general release, waiving his right to raise "any and all claims . . . of whatever type or nature" against his former employer. *Id.* at *2. The court construed this release to apply to his unemployment-benefits claim. *Id.* at *10. But under Ohio statutory law, parties cannot legally waive their right to claim unemployment benefits. *Id.* (citing Ohio Rev. Code § 4141.32). So the court refused to apply the release to bar the plaintiff's unemployment-benefits claim. *Id.* Ohio courts engage in similar analysis for worker's-compensation-claim waivers, *see McHenry v. Mihm*, No. 2829, 1992 Ohio App. LEXIS 1769, at *4, 6–10 (Ohio Ct. App. Apr. 3, 1992), and prospective waivers of future discrimination claims, *see Adams*, 67 F.3d at 584–85.

From these cases we can extract a simple rule: a generally worded release can bar claims that are waivable, but it cannot bar claims that aren't waivable. A general release is not void on its face; rather, its enforceability depends on the claim that is to be released. If we were to reject this rule and instead adopt Hank's position, then practically every generally worded release would be facially void, since any such release could *conceivably* be applied to claims where waiver is barred

by statute. But this cannot be true, because Ohio courts routinely uphold and enforce general releases. *See, e.g.*, *State ex rel. County of Cuyahoga v. Jones Lang Lasalle Great Lakes Co.*, No. 104157, 2017 Ohio App. LEXIS 4129, at *44–51 (Ohio Ct. App. Sept. 21, 2017).

Here, the release is generally worded, but it is being applied to claims that can be waived without violating public policy. Therefore, the release was not void from the beginning.

### 2. Consideration

Hank next contends that the release is invalid for lack of consideration. According to Great Lakes and the Union, there was consideration: Great Lakes would grant Hank layoff status instead of firing him for cause, and in return Hank would release his claims against the company and the union. Hank considers this insufficient. His theory boils down to five different arguments: (1) granting the right to file for unemployment benefits is not consideration because Hank already had the statutory right to file, (2) the exact consideration was not recited in the contract, (3) granting layoff status is insufficient consideration because Hank was going to be laid off anyway, (4) Hank signed the release under duress, and (5) there was a mutual mistake of material fact over whether Great Lakes could prevent Hank from filing an unemployment-benefits claim.[2] We find each of these arguments unavailing.

To be enforceable under Ohio law, a contract must be supported by consideration. *Lake Land Emp't Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 32 (Ohio 2004). "Consideration is a bargained for exchange between parties." *Cuspide Props., Ltd. v. Earl Mech. Servs., Inc.*, 53 N.E.3d 818, 830 (Ohio Ct. App. 2015). The exchange can involve "either a detriment to the promisee or a benefit to the promisor." *Columber*, 804 N.E.2d at 32. Here, Hank was receiving the benefit of layoff status, as opposed to being fired for cause. In exchange, he was incurring the

---

[2] Some of these are affirmative defenses to contracts, but Hank presents them as one umbrella consideration argument.

detriment of waiving his right to bring claims against Great Lakes and the Union.[3] Hank now contests whether Great Lakes granting him layoff status is sufficient consideration.

Forbearance from exercising a legal right is sufficient consideration. *HomEq Servicing Corp. v. Schwamberger*, No. 07CA3146, 2008 WL 2151996, at *5 (Ohio Ct. App. May 20, 2008). And under the collective bargaining agreement, Great Lakes had the legal right to terminate Hank for cause. Great Lakes retained the right to "discharge any employee whose work is unsatisfactory." The company could also terminate employees for "fail[ure] to observe the safety precautions or other rules and regulations prescribed . . . for the health, safety, and protection of its employees." Moreover, in its employee manual, Great Lakes prohibits "[f]alsification of company . . . forms, documents or records" and "[f]ailure to provide a fair day's work for a fair day's pay." Both actions are "misconduct" under the manual, and misconduct "will result in disciplinary action, up to and including termination." We therefore agree with the district court that Great Lakes had the right under the agreement to fire employees for falsifying timecards, so giving up that right is sufficient consideration for the release.

Moreover, in the employment context, promises to help facilitate a former employee's unemployment-benefits application are sufficient consideration. *Bruner-Cox v. Dimengo*, No. 17732, 1997 WL 72095, at *2–3 (Ohio Ct. App. Feb. 12, 1997). In *Bruner-Cox*, the court upheld a settlement contract in which an employer promised not to challenge any unemployment-benefits claim that the former employee brought. *Id.* As the district court correctly observed, such a promise not to dispute an application for unemployment benefits is consideration under Ohio law.

---

[3] Promising not to bring a colorable legal claim is sufficient consideration. *Coate v. Harley*, 52 N.E.2d 672, 674 (Ohio Ct. App. 1943).

Here, Great Lakes declined to terminate Hank for cause—forbearing something it had the legal right to do—and granted him layoff status to facilitate his potential unemployment-benefits claim. We agree with the district court that this is sufficient consideration under Ohio law.

Hank makes several arguments to the contrary, none of which are persuasive. He grounds his first argument in the fact that he was already entitled to file for unemployment benefits under Ohio statutory law. If Great Lakes was offering to allow Hank to file for unemployment benefits, then that could not be consideration, because Hank would not be gaining any benefit; he already could have filed for those benefits. *See* Ohio Rev. Code § 4141.32. True, but that's not what Great Lakes was offering. Great Lakes was not offering to *allow* Hank to file for unemployment benefits. Instead, it was offering to *facilitate* his future claim by placing him on layoff status. And that facilitation provided him with a benefit because it made it more likely that he would succeed on his claim. Without layoff status, Hank's chances of obtaining benefits were lower. Previous Ohio cases illustrate why: claimants who filed for benefits after being fired for cause—specifically for falsifying their timecards—have been denied. *See, e.g.*, *Schneider v. United Parcel Serv., Inc.*, No. 98504, 2013 WL 1183326, at \*1–2 (Ohio Ct. App. Mar. 21, 2013). So that argument fails.

Second, Hank argues that the release was silent as to unemployment claims and benefits. Effectively, this boils down to an argument that the consideration for a written agreement must be stated in the agreement itself. But Hank cites no authority for this proposition, and it turns out that quite the opposite is true in Ohio. "[C]onsideration for a contract need not necessarily be recited or expressed in writing; instead, the consideration may be proved by parol evidence or may be inferred from the terms and obvious import of the contract." *Harvest Land Co-Op, Inc. v. Hora*, No. 25068, 2012 WL 6554728, at \*2 (Ohio Ct. App. Dec. 14, 2012) (citing 17 *Ohio Jurisprudence 3d*, *Contracts*, § 40). And here, Great Lakes has provided parol evidence of the consideration. As

Great Lakes points out in its brief, both Hank and Great Lakes' vice president of operations (who was in the meeting with Hank) acknowledged in their depositions that the layoff status was granted so that Hank could successfully get unemployment benefits. Therefore, we agree with the district court that there was consideration even though the release did not facially mention unemployment benefits.

Third, Hank argues that the consideration was a "sham" because he was going to be laid off anyway. He points to internal emails from Great Lakes employees saying that the company "may be parting ways with [Hank] soon" because "Lay-off season" was approaching. And because Great Lakes was already going to lay him off, so the argument goes, offering to lay him off *now* would amount to a "something-for-nothing" waiver. We disagree. Even if Hank is right that Great Lakes already decided to lay him off months ago, that still does not make this a "something-for-nothing" waiver, because the consideration for the release was laying him off *instead of* firing him for cause. And as we've already discussed, foregoing the right to fire Hank for cause was both a detriment to Great Lakes and a benefit to Hank.

Fourth, Hank argues that there was a mutual mistake of material fact that defeats consideration. He claims that he only signed the release because Great Lakes said he "couldn't collect unemployment if [he] didn't." But this statement means that Hank and Great Lakes were on the exact same page. As discussed above, if Hank filed for unemployment benefits after being fired for falsifying his timecards, odds are he would have been denied. So in that sense, Hank would not have been able to collect unemployment benefits unless he signed the release. That means both parties knew exactly what the consideration was: placing Hank on layoff status so that he could successfully collect the benefits. We thus agree with the district court that there was no mutual mistake of fact.

Finally, Hank argues that he signed the release under duress. He again cites no authority for this argument. Under Ohio law, to succeed on a claim of economic duress, plaintiffs need to show that they were subjected to a "wrongful or unlawful act" that deprived them of their "unfettered will." *Blodgett v. Blodgett*, 551 N.E.2d 1249, 1251 (Ohio 1990) (quoting 13 *Williston on Contracts* § 1617, at 704 (3d ed. 1970)). It is not generally a "wrongful or unlawful act" if the defendant threatens to do something that it is legally entitled to do. *Togo Int'l v. Mound Steel Corp.*, 665 N.E.2d 1160, 1164 (Ohio 1995). And because Great Lakes was entitled to fire Hank for cause for falsifying timecards, threatening to do so is not a "wrongful or unlawful act," so Hank's duress argument fails.

### 3.  Knowing and Voluntary

In one final challenge to the release, Hank argues that he did not sign it knowingly and voluntarily. We assume, as the district court did, that the five-part "knowing and voluntary" standard is applicable for assessing whether a waiver is valid, and like the district court, we conclude that Hank signed the release knowingly and voluntarily.

Under Sixth Circuit precedent, courts look to five factors when assessing whether a waiver was knowing and voluntary:

> (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Seawright v. Am. Gen. Fin., Inc.*, 507 F.3d 967, 974 (6th Cir. 2007) (quoting *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003) (en banc)). Accordingly, we will assess each of these factors in turn.

First, Hank has sufficient experience, background, and education. Hank is a forty-nine-year-old man with a GED, post-high-school level proficiency in reading and word comprehension, and high-school-level spelling skills.

On the first factor, Hank focuses on his lack of business or legal experience. But courts have upheld releases signed by plaintiffs with even less experience. For example, as the district court noted, in *Sako v. Ohio Department of Administrative Services*, the court upheld a release even though the plaintiff, like Hank, had only the equivalent of a high school diploma and no business or legal experience—plus, English was not his first language. No. 2:06-cv-0728, 2007 WL 1500905, at *6–7 (S.D. Ohio May 21, 2007). Although Hank attempts to distinguish *Sako* on other bases, he does not dispute that the plaintiff there had less education and English comprehension skills than he has.[4] Instead, he points to cases in which the court upheld a release as knowing and voluntary where the plaintiff was *more* qualified than him. These cases demonstrate what could qualify as sufficient levels of experience and education, but nothing in the cases establishes the levels described as the minimum levels necessary for a release to be knowing and voluntary.

Second is the amount of time Hank had to consider the waiver, including whether he had the opportunity to consult a lawyer. Hank argues that Great Lakes never informed him that he could take additional time or consult an attorney. But Great Lakes didn't need to. Factor two weighs in favor of finding a knowing and voluntary waiver if the plaintiff simply does not request more time to either review the waiver or consult an attorney. *Shupe v. Asplundh Tree Expert Co.*,

---

[4] Hank's best case on factor one comes from the Southern District of New York, a case called *Grant-Hyndman v. Olivetti Management of America*, No. 95 Civ. 7736 (CSH), 1997 U.S. Dist. LEXIS 15690, at *7 (S.D.N.Y. Oct. 9, 1997). There, the court found that the plaintiff had the advantage under factor one because she had only a high school diploma and, as a secretary, she did not have "substantial business experience." *Id.* But that case is distinguishable: the court there found that the release's wording both was "misleading" and did not "in any way make clear the terms of the bargain," so someone with the plaintiff's education and experience would not have understood it. *Id.* at *8–9. In contrast, here the release was shorter and written in plain English.

566 F. App'x 476, 482–83 (6th Cir. 2014). *See also Schambon v. Orkin, LLC*, No. 1:16-CV-00130-GNS, 2017 WL 1319834, at *4 (W.D. Ky. Apr. 5, 2017); *Moore v. Ferreligas, Inc.*, 533 F. Supp. 2d 740, 749 (W.D. Mich. 2008). Hank does not allege that he asked for either, so this factor weighs in favor of finding a knowing and voluntary waiver.

Third is the clarity of the waiver. The district court concluded (and we agree) that because the release was written in plain English and only one paragraph long, it was entirely possible for someone of Hank's ability to understand. There was no technical legal or business jargon, and it made the terms of the bargain clear.

Fourth is the consideration for the waiver. As we already determined, this release was supported by adequate consideration.

Finally, the court may consider the totality of the circumstances, meaning any additional factors relevant to whether a release was knowing and voluntary. Hank does not cite any additional circumstances under this factor; instead, he restates his previous arguments. We therefore find no additional circumstances weighing in Hank's favor.

Therefore, considering the five factors, we find that Hank signed the release knowingly and voluntarily.[5] We accordingly conclude that Hank knowingly and voluntarily signed a valid release. Doing so barred his claims against Great Lakes, so summary judgment in its favor was proper.

---

[5] Hank also contends that he was constructively discharged and that the release he signed violated the Older Workers Benefit Protection Act (OWBPA). On the constructive discharge point, all the cases he cites deal with employees given the choice between termination and voluntary resignation, which was not the choice Hank was given. As the district court noted, Hank does not explain why the constructive-discharge standard should be applied to his case. Moreover, the analysis under constructive discharge, like that under waivers, turns on whether the employee's actions were voluntary. Because we have already concluded that Hank signed the release knowingly and voluntarily, we see no reason engage in another duplicative discussion of voluntariness under a standard that does not apply to this case. On the OWBPA point, that statute's protections are irrelevant here. OWBPA "amended the Age Discrimination in Employment Act ('ADEA'), to set forth specific requirements for the release of ADEA claims." *Southworth v. N. Trust Sec., Inc.*, 960 N.E.2d 473, 478 n.1 (Ohio Ct. App. 2011). Plaintiff has not alleged any violation of the ADEA, and he does not argue that Ohio Rev. Code § 4112 incorporates the OWBPA's protections.

### B. The Union

We now turn to the judgment in favor of the Union. The district court reached a merits decision only on one claim, the "Hybrid Section 301" claim. Once it determined that the claim should be dismissed, it then remanded the remaining state-law claims to the Ohio state court. Thus, our review is limited to the Section 301 claim.

Hank alleges that the Union breached its duty of fair representation to him. His complaint refers to this claim as a "Hybrid Section 301," meaning Section 301 of the Labor Management Relations Act (LMRA). 28 U.S.C. § 185. But Hank now alleges that his claim against the Union also arises under Section 9(a) of the National Labor Relations Act (NLRA). 29 U.S.C. § 159(a). Which raises a preliminary question: what's the difference?

Both Section 9(a) of the NLRA and Section 301 of the LMRA deal with unions breaching their duties of fair representation to their members. Courts have interpreted Section 9(a) to impose on unions a freestanding duty of fair representation, not connected to any collective bargaining agreement. *Vencl v. Int'l Union of Operating Eng'rs, Local 18*, 137 F.3d 420, 424 (6th Cir. 1998). In contrast, claims under Section 301 must be connected to a collective bargaining agreement; to succeed, plaintiffs must show both that the employer breached the agreement and that the union breached its duty of fair representation. *Id.*

In his complaint, Hank mentioned only Section 301. But he now argues that he can survive summary judgment under Section 9(a) as well. The district court determined that his complaint was really one under Section 301, so it declined to hear his Section 9(a) argument. We agree.

To be sure, Hank is correct that he did not need to cite Section 9(a) in his pleadings in order to assert a Section 9(a) argument at some point in the case. Under the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement" setting out the grounds for

relief. Fed. R. Civ. P. 8(a)(2). Accordingly, plaintiffs need not expressly cite a cause of action in their complaint for it to sufficiently raise a claim under that cause of action. *Knapp v. City of Columbus*, 93 F. App'x 718, 720 (6th Cir. 2004) ("The Federal Rules of Civil Procedure simply do not require any magic words or recitations to be made in a complaint . . . .").

But the Federal Rules of Civil Procedure are not the only relevant authority. Also applicable here is *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 561–62 (6th Cir. 1990). That case dealt with a claim that, according to the plaintiff, arose under both Section 9(a) of the NLRA and Section 301 of the Labor Management Relations Act. *Id.* When faced with such a claim, the *White* court instructed courts to look to the complaint's "essential nature" to determine whether the claim properly falls under Section 9(a) or Section 301. *Id.* at 562. Accordingly, if the complaint states a "colorable claim" under the collective bargaining agreement, then it should be construed as a Section 301 claim. *Pratt v. UAW, Local 1435*, 939 F.2d 385, 389 (6th Cir. 1991); *Cavanaugh v. UAW Int'l Union*, No. 15-13223, 2017 WL 445599, at *6 (E.D. Mich. Feb. 2, 2017).

Here, not only is there a colorable claim under the collective bargaining agreement, the complaint itself alleges that the Union breached its duty of fair representation *under the agreement. See Vencl*, 137 F.3d at 425. Accordingly, we agree with the district court that this case properly falls under Section 301 of the Labor Management Relations Act.

Under Section 301 of the LMRA, plaintiffs can sue for "violation of contracts between an employer and a labor organization," more often called collective bargaining agreements. 28 U.S.C. § 185(a). Often, as here, plaintiffs will bring so-called "hybrid" claims under Section 301, which implicate both the employer and the union. *See Hines v. Anchor Motor Freight Co.*, 424 U.S. 554, 570–71 (1976). To succeed on a hybrid claim against either the employer or the union, the plaintiff "must show that the Company breached the Agreement *and* that the Union breached its duty of

fair representation." *Id.* Unless the plaintiff "demonstrates *both* violations, he cannot succeed against either party." *Bagsby v. Lewis Bros. of Tenn.*, 820 F.2d 799, 801 (6th Cir. 1987). Accordingly, if Great Lakes did not breach the collective bargaining agreement, then Hank's Section 301 claim against both Great Lakes and the Union must fail.

Under the agreement, Great Lakes had the authority to "discharge any employee whose work is unsatisfactory." Great Lakes was to be the "sole judge" of whether an employee's work was satisfactory. Great Lakes also retained "its inherent rights to manage its business."

Hank, for his part, points to the same provision of the agreement, just to different language in that provision. The language Hank cites gives Great Lakes the right to discharge employees who "fail[] to observe the safety precautions or other rules and regulations prescribed by [Great Lakes] for the health, safety and protection of its employees." Although Great Lakes maintained that its rule against timecard falsification (in the employee handbook) fell under the "rules and regulations" provision, Hank argues that this provision applies only to those rules or regulations that are designed for the "health, safety and protection" of Great Lakes employees—and timecard falsification has nothing to do with health, safety, or protection. Maybe. But we need not decide how to read "rules and regulations" under the agreement, because Hank does not rebut Great Lakes' argument on the other grounds. He does not explain why falsifying timecards shouldn't count as "unsatisfactory" work performance—at least beyond his own conclusory statement that such falsification is not "work performance." Nor does he explain why firing an employee for "stealing time" from the company wouldn't fall under Great Lakes' retained "inherent right to manage its business." Therefore, we conclude that Great Lakes had the right to fire Hank for falsifying his timecards under the collective bargaining agreement.

Hank also claims that his termination violated the collective bargaining agreement because it was in retaliation for filing a worker's compensation claim. However, we agree with the district court that Hank has not produced any evidence to make out a prima facie case of retaliation, beyond his own conclusory statements in his affidavit. Therefore, his retaliation claim also fails. Because we find that there was no breach of the collective bargaining agreement, we need not address the question of whether the Union breached its duty of fair representation. *See Bagsby*, 820 F.2d at 803.

## III.

For those reasons, we AFFIRM the judgment of the district court.